AO 91 (Rev. 11/11) Criminal Complaint

# UNITED STATES DISTRICT COURT
for the
Eastern District of Virginia

FILED
JAN 23 2019
CLERK, U.S. DISTRICT COURT
RICHMOND, VA

| United States of America | ) | |
|---|---|---|
| v. | ) | |
| ZELJKO STJEPANOVIC | ) | Case No. 3:19MJ19 |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| *Defendant(s)* | ) | |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of ___listed below___ in the county of _____ in the ___Eastern___ District of ___Virginia___, the defendant(s) violated:

| *Code Section* | *Offense Description* |
|---|---|
| 21 U.S.C. Section 841 | on or about August 31, 2017; January 19, 2018; February 16, 2018; and March 15, 2018, defendant did knowingly, intentionally, and unlawfully distribute and dispense, cause to be distributed and dispensed, and attempt to cause to be distributed and dispensed a mixture and substance containing detectable amounts of oxycodone, a Schedule II controlled substance (January 19, 2018, February 16, 2018, and March 15, 2018), and tramadol, a Schedule IV controlled substance (August 31, 2017, February 16, 2018, and March 15, 2018) |

This criminal complaint is based on these facts:
See attached affidavit

☑ Continued on the attached sheet.

Reviewed by AUSA/SAUSA:
Stephen W. Miller

_____
Complainant's signature

CHUCK CONNELLY SA
Printed name and title

Sworn to before me and signed in my presence.

Date: 1/23/2019

/s/ _____
Roderick C. Young
United States Magistrate Judge
*Judge's signature*

City and state: Richmond, VA

Printed name and title

## AFFIDAVIT OF SPECIAL AGENT CHARLES CONNELLY

I, Charles Connelly, being duly sworn, depose and state as follows:

1. I am a Special Agent ("SA") of the United States Drug Enforcement Administration ("DEA") and am an investigative or law enforcement officer of the United States within the meaning of Title 18, United States Code, Section 2510(7), who is empowered to conduct investigations of, and make arrests for the narcotics offenses enumerated in Title 18, United States Code, Section 2516.

2. I have been employed by the DEA since May 2012. Currently, I am assigned to the Richmond/Norfolk Tactical Diversion Squad, in Norfolk, Virginia. I have received sixteen weeks of specialized narcotics law enforcement training at the United States Drug Enforcement Administration Academy, located in Quantico, Virginia. During my employment with DEA, I have participated in the surveillance and arrest of numerous drug traffickers. I have debriefed numerous persons arrested for controlled substance violations and have debriefed and directed confidential informants in gathering controlled substance intelligence. Also, I have spoken with experienced narcotics investigators concerning the methods and practices of narcotic traffickers. Through my experience and training and my conversations with other senior investigators, I have become familiar with the manner in which controlled substances are imported, manufactured, distributed, sold, and diverted. In addition to my training, I have acquired experience involving the characteristics of offenses involving prescription drugs and procedures regarding the investigation of suspicious activities involving prescription drugs. I also have experience regarding the practices and procedures of pharmacists and physicians in dispensing prescription drugs, including physician and pharmacy procedures for detecting and preventing prescription drug abuse.

3.   While with DEA, I have participated in numerous investigations into the unlawful importation, possession with intent to distribute, and distribution of controlled substances, as well as the related laundering of monetary instruments, the conducting of monetary transactions involving the proceeds of specified unlawful activities and conspiracies associated with criminal narcotics offenses, including the diversion of controlled substances involving medical professionals. In conducting these investigations, I have utilized a variety of investigative techniques and resources, including physical and electronic surveillance and various types of informants and cooperating sources. I am familiar with methods employed by narcotics trafficking organizations, and the sophisticated tactics they routinely use to attempt to thwart investigation of their narcotics organizations. I am also familiar with the methods both medical professionals and laypersons use to divert pharmaceutical controlled substances.

4.   This affidavit is submitted in support of a criminal complaint charging Doctor Zeljko STJEPANOVIC, MD ("STJEPANOVIC") with distribution of a controlled substance, in violation of 21 U.S.C. § 841(a)(1); STJEPANOVIC is a physician licensed to practice in the Commonwealth of Virginia and who had possessed DEA Registration number FS3042885.[1]

Since this affidavit is being submitted for the limited purpose of securing criminal complaint, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish

---

[1] A DEA registration number is a unique, identifying code that is given to a registrant by DEA, who is then authorized to handle controlled substances. A registrant may include a chemical company, a physician, a pharmacy, etc. Identifying numbers authorize registrants to handle a controlled substance in various ways, for e.g., the number may authorize a registrant to possess a controlled substance, to prescribe a controlled substance, or to dispense a controlled substance. In this case, STJEPANOVIC's DEA number authorized him to prescribe, administer, and dispense controlled substances in Schedules II through V.

probable cause to charge STJEPANOVIC with distribution of a controlled substance, in violation of 21 U.S.C. § 841(a)(1).

## RELEVANT STATUTES AND LEGAL FRAMEWORK

### I. Statutory and Regulatory Framework

5. Title 21, United States Code, Section 841(a)(1) prohibits, *inter alia,* the unauthorized knowing and intentional distribution or dispensation of a controlled substance.

6. Title 21, United States Code, Section 821 authorizes the Attorney General to promulgate rules and regulations relating to the dispensation of controlled substances.

7. Individuals and entities that handle or prescribe controlled substances are regulated by DEA under the provisions of the Controlled Substances Act ("CSA"), 21 U.S.C. §§ 801-971. Every person who manufactures, distributes, or dispenses controlled substances may do so only if such person obtains a DEA registration. 21 U.S.C. § 822(a).

8. DEA may register a practitioner to dispense controlled substances only if such practitioner is "authorized to dispense. . . controlled substances under the laws of the State in which he practices." 21 U.S.C. § 823(f). A "practitioner" is defined as "a physician. . . licensed, registered or otherwise permitted, by the United States or the jurisdiction in which he practices or does research, to distribute, dispense, conduct research with respect to, administer, or use in teaching or chemical analysis, a controlled substance in the course of professional practice or research." 21 U.S.C. § 802(21).

9. Title 21, United States Code, Section 802(10) provides that the term "dispense" means the delivery of a controlled substance to an ultimate user, and includes prescribing as well as administering controlled substances to that ultimate user.

3

10. Title 21, United States Code, Section 802(27) provides that the term "ultimate user" means a person who has lawfully obtained, and who possesses, a controlled substance for his own use or for the use of a member of his household or for an animal owned by him or by a member of his household.

11. Title 21, Code of Federal Regulations, Section 1306.04 governs the issuance of prescriptions. It provides, in pertinent part, "A prescription for a controlled substance to be effective must be issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice." And that, "The responsibility for the proper prescribing and dispensing of controlled substances is upon the prescribing practitioner . . . ."

**II. Virginia Board of Registration in Medicine**

12. Dr. Zeljko STJEPANOVIC is a licensed medical doctor in the Commonwealth of Virginia, with Virginia State License number 0101251045. Similar to federal guidance, Virginia law provides that in order for a prescription to be valid, it must be issued for a legitimate medical purpose, by a practitioner in the usual course of his or her professional practice.

13. Title 54, Professional and Occupations, Chapter 33. Pharmacy, § 54.1-3303 Prescriptions to be issued and drugs to be dispensed for medical or therapeutic purposes only, provides:

*A bona fide practitioner-patient-pharmacist relationship is one in which a practitioner prescribes, and a pharmacist dispenses, controlled substances in good faith to his patient for a medicinal or therapeutic purpose within the course of his professional practice. In addition, a bona fide practitioner-patient relationship means that the practitioner shall (i) ensure that a medical or drug history is obtained; (ii) provide information to the patient about the benefits and risks of the drug being prescribed; (iii) perform or have performed an appropriate examination of the patient, either physically or by the use of instrumentation and diagnostic equipment*

4

*through which images and medical records may be transmitted electronically; except for medical emergencies, the examination of the patient shall have been performed by the practitioner himself, within the group in which he practices, or by a consulting practitioner prior to issuing a prescription; and (iv) initiate additional interventions and follow-up care, if necessary, especially if a prescribed drug may have serious side effects. A practitioner who performs or has performed an appropriate examination of the patient required pursuant to clause (iii), either physically or by the use of instrumentation and diagnostic equipment through which images and medical records may be transmitted electronically, for the purpose of establishing a bona fide practitioner-patient relationship, may prescribe Schedule II through VI controlled substances to the patient, provided that the prescribing of such Schedule II through V controlled substance is in compliance with federal requirements for the practice of telemedicine.*

### III. DEA Registration

14. According to DEA, STJEPANOVIC was registered with DEA registration number FS3042885 with privileges, including dispensing and prescribing, for controlled substances in Schedules II through V.[2] In 2014, STJEPANOVIC provided his registered address as 2300 Charles Street, Suite 102, Fredericksburg, Virginia. However, on November 14, 2016, he changed it to 2216 Princess Anne Street, Suite 102, Fredericksburg, Virginia, 22401 ("Location #1", also known as "The Ailment Wellness Center") and on February 28, 2018, he changed it to

---

[2] On May 1, 2018 the DEA Administrator issued an Immediate Suspension Order (ISO) and Order to Show Cause that Dr. continued registration constituted an imminent danger to the public health or safety. The ISO was served upon STJEPANOVIC and his DEA registration was suspended. STJEPANOVIC did not request a hearing based on the ISO, so on July 25, 2018, DEA Chief Counsel filed a motion for Final Agency Action with the Administrator to revoke his DEA registration. That motion is still pending with the Administrator.

2004 Bremo Road, Suite 200, Richmond, Virginia, 23226 ("Location #2", also known as "The Pain Center").

## PROBABLE CAUSE

I. **Undercover Visits with STJEPANOVIC[3]**

<u>a. August 31, 2017 Visit with STJEPANOVIC at Location #1</u>

15. On August 31, 2017, at approximately 12:30 p.m., TFO Eileen Davis, while working in an undercover capacity, entered Location #1 for her scheduled appointment to see STJEPANOVIC. The receptionist told TFO Davis to come back to a room and have a seat to discuss her visit. The receptionist asked TFO Davis if TFO Davis had an MRI. TFO Davis told the receptionist she did not bring any paperwork with her and advised that she did not believe she ever had an MRI taken. The receptionist provided TFO Davis with paperwork titled "Ailment Wellness Medical Center Authorization for Release of Health Information." TFO Davis advised the receptionist she was unsure of the information she needed and who to contact to obtain the information. The receptionist said they normally require an MRI so they can determine where the pain is coming from. The receptionist said she would speak with STJEPANOVIC and explain TFO Davis' situation; however, the receptionist was doubtful that STJEPANOVIC would see TFO Davis that day. The receptionist explained how TFO Davis could pick-up her medical history from the hospital and again TFO Davis explained to the receptionist that TFO Davis has never been in the hospital and would not know where to bring the request. TFO Davis told the

---

[3] Unless otherwise noted, all visits detailed herein were audio and/or video recorded and were surveilled by law enforcement. All monies used during these visits were provided by DEA and had its serial numbers recorded.

receptionist that she was living locally with a friend and TFO Davis did not know where to go to see a doctor for anything in the local area.

16. The receptionist left the room briefly, then returned and said she had spoken with STJEPANOVIC. He offered two choices: TFO Davis could wait until she obtained a copy of an MRI and then be seen by STJEPANOVIC or TFO Davis could be seen as a new patient, pay for the office visit and STJEPANOVIC would write TFO Davis a prescription for an X-ray, which is cheaper than an MRI. TFO Davis agreed to see STJEPANOVIC as a new patient and paid the receptionist $600 U.S. Currency. TFO Davis asked the receptionist if STJEPANOVIC would be able to write her a prescription for Adderall. The receptionist suggested that TFO Davis needed to speak to STJEPANOVIC about that and asked if TFO Davis had ever had a prescription for Adderall. The receptionist again confirmed with TFO Davis her name and date of birth, walked to her computer and appeared to conduct a search on her computer. The receptionist advised TFO Davis that she observed in 2016 that TFO Davis had received a prescription for Adderall for two days, with a quantity of twelve pills.[4] TFO Davis agreed with the receptionist and observed the receptionist print the report and place it in a folder. The receptionist said she would speak with STJEPANOVIC and would inform TFO Davis what STJEPANOVIC said.

17. The receptionist called TFO Davis to the back of the office, took her weight and then advised TFO Davis that she needed to provide a urine sample. TFO Davis advised that she was

---

[4] Based upon my experience and my involvement in this case, I believe that the receptionist was querying TFO Davis's undercover name in the Virginia Prescription Monitoring Program, which is more fully explained below. I further believe that the receptionist found a positive record for an individual with the same name as TFO Davis's undercover identity.

7

not able to provide one. The receptionist advised TFO Davis that she would need to provide a urine sample before the end of her appointment. The receptionist escorted TFO Davis to the exam room and said she would take TFO Davis' vitals and STJEPANOVIC would be in momentarily. The receptionist placed TFO Davis' chart on the counter and stepped out of the room.

18. Moments later, STJEPANOVIC entered the exam room, shook TFO Davis' hand and sat on a chair in the corner of the room. STJEPANOVIC asked TFO Davis several questions, including whether TFO Davis had children, was married or divorced, or had any allergies, and about her smoking habits. STJEPANOVIC then asked TFO Davis about her overall health. He specifically asked TFO Davis when she felt discomfort in her neck, the area where she said she had pain. TFO Davis told STJEPANOVIC it had not been recently but had been approximately two months earlier. TFO Davis advised STJEPANOVIC that she had pain in the past and always took Tramadol because it made her feel good, explaining that Tramadol was all she had taken for the pain.[5] She also told STJEPANOVIC that she had gotten the Tramadol from her boyfriend, who had a prescription for it. When STJEPANOVIC asked TFO Davis if she had more pain or less, she said, "no, it's not bad, and it's not all the time." TFO Davis explained that she has taken Tramadol for years and is used to it. STJEPANOVIC then mentioned querying the prescription monitoring program.

19. STJEPANOVIC said he would write TFO Davis a prescription for a scan. While writing the prescription, STJEPANOVIC asked TFO Davis what kind of exercise she is doing to keep in

---

[5] Tramadol, a Schedule IV controlled substance, is an opioid analgesic commonly sold by the brand name Ultram.

8

shape. After several minutes of talking, STJEPANOVIC said he was going to write a prescription for Tramadol and then left the room.

20. At no point did STJEPANOVIC or anyone acting on his behalf conduct any physical examination of TFO Davis or attempt to determine the extent of the reported pain in her neck, range of motion or history of the pain. In addition, STJEPANOVIC did not discuss with TFO Davis treatments other than the Tramadol requested by TFO Davis. Nonetheless, STJEPANOVIC's notes for the visit state that he had reviewed her medical history, the patient reported her pain was increasing, and the patient would start exercising.

21. The receptionist entered the room and said STJEPANOVIC would give TFO Davis a prescription for Tramadol. The receptionist informed TFO Davis that STJEPANOVIC wanted a CT scan instead of an MRI because a CT scan is less expensive. The receptionist told TFO Davis that STJEPANOVIC really wanted this done by the time TFO Davis returned for her next appointment. The receptionist told TFO Davis that she needed to provide a urine sample the day of this first visit to test TFO Davis for controlled substances. When TFO Davis again said she was unable to provide a urine sample because she did not have to go to the bathroom, the receptionist said she did not have time to wait and would get the urine sample at the next appointment.

22. The receptionist handed TFO Davis a prescription for (84) 50-mg Tramadol pills and a prescription for a CT Scan. TFO Davis then exited Location #1.

b. January 19, 2018 Visit with STJEPANOVIC at Location #2

23. Investigators learned that since the first visit by TFO Davis, STJEPANOVIC had moved his practice to The Pain Center at location #2. On January 19, 2018, at approximately 11:00 a.m., TFO Davis and a second undercover officer, DEA Task Force Officer Kimberly Dabbs

("TFO Dabbs"), both working in an undercover capacity, entered Location #2 for a scheduled appointment for TFO Davis to see STJEPANOVIC.

24. The employees at the Pain Center requested identification from both TFO Davis and TFO Dabbs, which they provided. They also requested that TFO Davis and TFO Dabbs complete a registration form. One of the employees asked TFO Dabbs to provide a urine sample, but TFO Dabbs responded that she did not need to go to the bathroom at that time.

25. TFO Dabbs partially completed the registration form, but left blank the section asking her to describe her level of pain. TFO Dabbs returned the form to the employees at the front desk. The receptionist told TFO Dabbs the cost of the visit was $250. TFO Dabbs paid the receptionist $250 in U.S. Currency and was given two receipts. A female nurse later brought TFO Davis and TFO Dabbs to a small office in the back that consisted of two chairs and a desk where the nurse had a small iPad and a blood pressure monitor. The nurse asked TFO Dabbs a few questions and documented the answers on the iPad and then checked TFO Dabbs' blood pressure. TFO Davis told the nurse that she had been a patient of STJEPANOVIC's at his previous practice in Fredericksburg. The nurse left the room and moments later returned with STJEPANOVIC. He told TFO Davis that he could not see her that day because she was not a new patient and that he had issues with his prior boss in Fredericksburg (Location #1), who threatened to sue him if he saw any patients he had seen there.

26. Both TFOs Davis and Dabbs were then moved to another room where they were introduced to a white male. He said he was an ex-cop and was there to screen the patients who were prescribed opioids to make sure they were not abusing or selling the pills. He gave TFO Dabbs the rules of the program, including how to dispose of her medication. The male

pulled up an application on the computer and began asking a series of questions. While doing so, TFO Dabbs observed the male filling in answers to questions that she had not provided.

27. After that, TFOs Davis and Dabbs were escorted to another office to see STJEPANOVIC. This room consisted of a desk and chairs, with no examination table nor any items that would typically be found in a medical examination room. STJEPANOVIC entered the room, sat behind a desk across from the officers, and asked TFO Dabbs what he could do for her. When TFO Dabbs said she wanted a prescription, STJEPANOVIC responded, "Give me the happy pills." TFO Dabbs told STJEPANOVIC that she was currently using Tramadol, Percocet[6], and Adderall. The conversation then continued:

| | |
|---|---|
| STJEPANOVIC: | What you want to me to give to you, because you cannot get Tramadol and Percocet in the same time. |
| TFO Dabbs: | Percocet. |
| STJEPANOVIC: | I give you Oxycodone, okay? Instead for Percocet. |
| TFO Dabbs: | Okay. |
| STJEPANOVIC: | Until we see what will happen. |
| TFO Dabbs: | Okay. |
| TFO Davis: | Are you gonna to be able to write her a prescription for Tramadol, like me? |
| STJEPANOVIC: | Either or, either…well, I cannot do at the same time. I give her, I will give her double dose of ten (10) milligram right now, and then you can, you know, I cannot say…[7] |

---

[6] Percocet is the brand name of a pill containing oxycodone, a Schedule II controlled substance.

[7] Based upon my experience and my involvement in this case, I believe that STJEPANOVIC was implying that he would write TFO Dabbs a prescription for a double dose of oxycodone pills with the intent that they be shared with TFO Davis, since he could not see TFO Davis that day due to his fear of being sued from his old practice.

11

28. STJEPANOVIC wrote TFO Dabbs a prescription for (90) 10-mg oxycodone pills and a prescription for a L-S Spine CT. As the undercover agents were leaving the office, STJEPANOVIC gave TFO Davis a tight hug while wrapping his arm on TFO Davis' lower back. STJEPANOVIC advised TFO Dabbs to come back next time with the scan.

29. At no point did STJEPANOVIC or anyone acting on his behalf conduct any physical examination of either TFO Davis or TFO Dabbs. When TFO Dabbs ran her hand from her mid-back to the top of the back side of her knee to demonstrate where the pain was, STJEPANOVIC reached across his desk, rubbed TFO Dabbs' behind, and asked if that was where the pain was. He did not or attempt to determine the extent of any reported pain, range of motion or history of the pain. In addition, STJEPANOVIC did not discuss with TFO Dabbs treatments other than the Oxycodone he prescribed, and did not discuss the risks associated with Oxycodone.

30. STJEPANOVIC's notes for the visit state that TFO Dabbs "is presenting with signs and symptoms of predominant lower back pain and peripheral nerve root sleeve irritation on the left leg. He did no examination to determine this. The notes also state that TFO Dabbs had "bilateral stabbing, burning, tingling, pins/needles," that aggravating factors "include sitting, standing, walking, bending forward, bending backward, lying flat, bending to the right side, bending to the left side, driving .cold weather and coughing/sneezing." None of this was discussed during the visit. The notes also reflect "conservative measures tried include physical therapy," and "patient continues on walking and Physical Therapy as needed." None of this was discussed during the visit either.

### c. February 16, 2018 Visit with STJEPANOVIC at Location #2

31. On February 16, 2018, at approximately 11:15 a.m., TFOs Davis and Dabbs, both working in an undercover capacity, entered Location #2 for a scheduled appointment for TFO Dabbs to see STJEPANOVIC.

32. TFO Dabbs signed in for her appointment and TFOs Davis and Dabbs were escorted to an office to have their blood pressure taken. While in the room, the nurse advised TFO Davis that although TFO Davis did not have an appointment, STJEPANOVIC would see her. The nurse asked TFO Davis what her level of pain was that day. TFO Davis responded, "Not much today, maybe a two." The nurse told TFO Davis, "You have to say something to be covered." The nurse asked TFO Davis for her birthdate, weight and height and said she was starting her chart. While seated in the nurse's office, at no time was TFO Davis asked where or what kind of pain she was having.

33. TFOs Davis and Dabbs then met together with the same male they had met with during the prior visit, who was seated in a back room in front of a computer. He asked TFO Davis a series of questions related to her pain level and previous medication/drug use. TFO Davis answered the male's questions, admitting to borrowing friends' prescription medications. The male appeared to enter all of TFO Davis's responses to his questions into his computer.

34. The male left the room and moments later came back and advised TFO Davis that STJEPANOVIC was ready to see her. The male advised TFO Dabbs to stay seated until STJEPANOVIC was done with TFO Davis.

35. During his meeting with TFO Davis, STJEPANOVIC again expressed his reluctance to see her for fear of being sued by his former practice. However, STJEPANOVIC stated, "What I was thinking in the beginning according, that you are so nice, and I know that is illegal, but I

13

technically can write down those medications on [sic] her name." TFO Davis agreed. STJEPANOVIC went on to explain that he could see TFO Davis as his own patient in a few months and further stated, "In the first couple months, I will just put everything on her name if that's is okay."[8]

36. While TFO Davis was with STJEPANOVIC, TFO Dabbs stayed with the male, who told TFO Dabbs that he needed to ask her a few questions. The male asked TFO Dabbs if she had provided a drug test at her last visit. TFO Dabbs said she have given a urine sample her last visit, which was not true. The male asked TFO Dabbs if she had her prescription bottles from her last visit. TFO Dabbs stated she did not.

37. The male then walked TFO Dabbs to the office where TFO Davis and STJEPANOVIC were located. STJEPANOVIC explained to TFO Dabbs, "Your friend cannot get it on me. We did talk about to put her Tramadol on your name as well. Is that okay?" TFO Dabbs responded that it was. STJEPANOVIC further stated, "Is that okay? I'm sorry, is [sic] illegal, but you know..." STJEPANOVIC then explained to TFO Dabbs what to say to the pharmacist should the pharmacist question why she had the two prescriptions. He then wrote TFO Dabbs two prescriptions, one for (90) 10-mg oxycodone pills and the other for (90) 50-mg Tramadol pills. TFO Davis and TFO Dabbs then exited Location #2.

38. At no point did STJEPANOVIC or anyone acting on his behalf conduct any physical examination of either TFO Davis or TFO Dabbs, or attempt to determine the extent of any reported pain, range of motion or history of the pain. Indeed, no one even asked TFO Davis

---

[8] I believe that STJEPANOVIC was offering to write a prescription for Tramadol for TFO Davis in TFO Dabbs's name until he felt comfortable he would not get sued by his previous practice for seeing TFO Davis.

about her pain. In addition, STJEPANOVIC did not discuss with either TFO Davis or TFO Dabbs treatments other than the medication.

39. As STJEPANOVIC was pretending not to treat TFO Davis, he has no notes of his meeting with her. His notes for TFO Dabbs state that her urine "was positive for Oxycodone on her last visit." In fact, neither TFO Dabbs nor TFO Davis ever provided a urine sample. The notes also state that TFO Dabbs "is coming with longstanding lower back pain and sharp pain in both legs. Patient has DJD, radiculopathy and arthritis." None of this was discussed with or provided by TFO Dabbs.

### d. March 15, 2018 Visit with STJEPANOVIC at Location #2

40. On March 15, 2018, at approximately 11:15 a.m., TFO Dabbs, working in an undercover capacity, entered Location #2 for a scheduled appointment to see STJEPANOVIC. An unknown white male ("UWM-2") asked TFO Dabbs for identifying information, such as name and address. He asked if TFO Dabbs was seeing the doctor for pain management and she said yes. UWM-2 informed TFO Dabbs that the visit would cost $150. TFO Dabbs then paid $150 in U.S. Currency. UWM-2 escorted TFO Dabbs to a small room.

41. Moments later STJEPANOVIC entered the room and greeted TFO Dabbs and instructed her to follow him to his office. Once there, STJEPANOVIC sat down behind his desk at the computer. While looking at his computer STJEPANOVIC said to TFO Dabbs, "I see you have a higher pain level 4." TFO Dabbs said "yeah," but had not reported any pain levels to anyone that day, including STJEPANOVIC. STJEPANOVIC said, "It was 2 or 3 before," and asked why. TFO Dabbs stated she did not know, but that she has good and bad days.

42. STJEPANOVIC stated, "I need a report here from you, pain lower back, shooting pain in left leg?" TFO Dabbs agreed. STJEPANOVIC stated he would discharge TFO Dabbs if she did

not bring the scan to her next visit. STJEPANOVIC told TFO Dabbs that he could not keep seeing her for months without having it and that if the DEA came now they would look for it. STJEPANOVIC stated, "I could scan it to your file then we are ok. She is really sick lady, let's help her."

43. STJEPANOVIC began writing on a prescription pad and asked TFO Dabbs how she was sleeping. TFO Dabbs stated better. TFO Dabbs and STJEPANOVIC had small talk about the doctor vacationing with his family. STJEPANOVIC then asked TFO Dabbs if she wanted him to do the same as last time, "You need for girl or not?"[9] TFO Dabbs said, "Yeah she asked me to get it." STJEPANOVIC continued to write the prescriptions and remarked, "Stay quiet, do your stuff, don't change, that's why you don't change pharmacies so they don't recheck every time."

44. STJEPANOVIC finished writing the prescriptions. He got up from the desk and walked towards TFO Dabbs. STJEPANOVIC engaged TFO Dabbs with a front hug wrapping both arms around TFO Dabbs lower back caressing the upper area of TFO Dabbs' buttocks. STJEPANOVIC escorted TFO Dabbs from his office towards the receptionist desk, while walking down the hall he kept his arm wrapped around TFO Dabbs waist line. As STJEPANOVIC and TFO Dabbs approached the front desk area he released his hold and walked behind the counter where the UWM-2 was sitting. STJEPANOVIC gave TFO Dabbs the two prescriptions, one for (90) 50-mg Tramadol pills and one (90) 10-mg oxycodone pills. TFO Dabbs then exited Location #2.

---

[9] I believe that STJEPANOVIC was asking if TFO Dabbs wanted a prescription for Tramadol for TFO Davis, who was not present.

45. At no point did STJEPANOVIC or anyone acting on his behalf conduct any physical examination of TFO Dabbs. He did not attempt to determine the extent of any reported pain, range of motion or history of the pain. In addition, STJEPANOVIC did not discuss with TFO Dabbs treatments other than the Oxycodone he prescribed, and did not discuss the risks associated with Oxycodone.

46. As TFO Davis was not even present for this visit, STJEPANOVIC has no notes regarding her, though he prescribed Tramadol for her.[10] His notes for TFO Dabbs state that the patient "reports worsening symptoms over the last month with more pain and stiffness due to cold weather. She reports more pain in lower extremities with shooting pain in left leg and less daily activites with limitation [sic] range of motion." They also state, "limited ROM [range of motion] of the neck," "limited range of motion of lower back and legs," and "minimally increased swelling and tenderness of lumbar spine and shooting pain in both legs. Increased pain upon movement of those joints." He performed no examination to reach this conclusion, and TFO Dabbs never reported any of this to STJEPANOVIC.

II. **Consultant's Evaluation of Controlled Substance Prescribing by STJEPANOVIC**

47. Investigators have consulted with Gene S. Kennedy, M.D., a licensed Medical Doctor in the State of Georgia. Investigators provided Kennedy with the audio/video recordings and/or transcriptions of the undercover operations, copies of the prescriptions obtained by TFO Davis and TFO Dabbs, as detailed above, as well copies of STJEPANOVIC's patient files for TFO

---

[10] In May 2018, DEA agents executed federal search warrants at Location #1 and Location #2 and seized, among other things, patient files, including those of TFO Davis and TFO Dabbs.

17

Davis and TFO Dabbs, and asked him to provide a written opinion whether the prescriptions provided by STJEPANOVIC to TFOs Davis and Dabbs were valid.

48. After reviewing the supplied information, Kennedy provided the following opinions:

    a. **Regarding the Prescriptions from August 31, 2017:**

*"In summary, the reviewed audio and video files alone do not adequately support the prescribing scheduled medications. Of course, it will be necessary to review the complete patient charts to provide a definitive statement about whether the prescriptions were medically legitimate and within the course of normal medical practice."*

    b. **Regarding the Prescriptions from January 19, 2018, and February 16, 2018:**

*"The physician unambiguously provided prescriptions to UC1 and UC 2 that were outside the course of usual medical practice and not for legitimate medical purpose. Further, he proposed a plan to continue providing them in the future. Review of the UC 2 medical chart would confirm the extent to which it has been falsified."*[11]

    c. **Regarding the Prescriptions from March 15, 2018:**

*"The physician again provided prescriptions to UC1 and UC2 that were outside the course of usual medical practice and were not for a legitimate medical purpose. He advised UC2 about maintaining a low profile to avoid detection of illicit prescriptions. Again, review of the UC2 medical chart would confirm the extent to which the associated documentation has been falsified."*

---

[11] In this review, "UC1" refers to TFO Davis and "UC2" refers to TFO Dabbs

### d. Summary Opinion

*"There is essentially nothing that is medically legitimate about any encounter between UC1, UC2 and either the male or Stjepanovic. All prescriptions provided were outside the course of normal medical practice and were not medically legitimate. The blatant falsification of medical records revealed in the surveillance media, particularly as it pertains to the illegitimate provision of scheduled medications, is confirmed by the clinical documentation and exceeds any level of credibility. It is inexcusable and does not represent any definition of legitimate patient care."*

## CONCLUSION

49. Based on the forgoing, I respectfully submit that there is probable cause to believe that Zeljko STJEPANOVIC committed the offense of distribution of a controlled substance, in violation of 21 U.S.C. § 841 (a)(1).

Charles Connelly
Special Agent
Drug Enforcement Administration

Sworn to before me this 23 day of January, 2019

/S/
The Honorable Roderick C. Young
United States Magistrate Judge
Eastern District of Virginia

19